Estate of Grace N. Williams, Deceased, Ralph E. Williams, Executor v. Commissioner.
Estate of Williams v. Commissioner
Docket No. 57441.
United States Tax Court
T.C. Memo 1956-239; 1956 Tax Ct. Memo LEXIS 55; 15 T.C.M. (CCH) 1235; T.C.M. (RIA) 56239; October 29, 1956
*55 John L. Flynn, Esq., United States National Bank Building, Portland, Ore., for the petitioner. Alonzo W. Watson, Jr., Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion This proceeding involves income tax deficiencies for the taxable years 1951 and 1952 in the amounts of $2,806.69 and $13,060.19, respectively. The sole contested issue is the fair market value of a certain growing hop crop on July 31, 1952, on which date the decedent acquired the crop, among other assets, in exchange for capital stock of Eola Hop Farms, Inc., as a liquidating dividend. Findings of Fact The stipulated facts are found accordingly. The growing hop crop here in question was planted on the Eola Hop Farm located in Marion County, Oregon. This farm consisted of a total of approximately 165 acres, of which 149.5 acres were planted to hops. Prior to 1950 the farm had been owned and operated by Grace N. Williams (hereinafter referred to as the decedent) and a co-partner, under the partnership name of Williams and Thacker. In 1950 the interest of the co-partner was purchased by the decedent, and thereafter until March 1, 1951, decedent operated the business as *56 a sole proprietorship. On March 1, 1951, all the assets and liabilities of the sole proprietorship were transferred by decedent to Eola Hop Farms, Inc., a corporation, in exchange for all of the capital stock of the corporation. From March 1, 1951, to July 31, 1952, the farming business was carried on by the corporation. Thereafter, farming operations were again carried on by decedent as a sole proprietorship. In 1953 the hop vines were pulled up and the growing of hops abandoned. The corporation reported a loss of $8,597.33 for its operations for the period from March 1, 1951, to December 31, 1951. For the seven months ending July 31, 1952, a loss was reported by the corporation in the amount of $339.12; however, in the computation of such loss the expenses incurred by the corporation in planting hops in March and caring for the 1952 crop up to July 31, 1952, were not deducted but were carried on the balance sheet of the corporation as an asset in the amount of $44,165.66. This sum was carried over and utilized by the decedent in computing the loss attributable to the 1952 hop crop. In addition to the above referred to expenses incurred by the corporation the decedent, operating *57 as a sole proprietor after July 31, 1952, incurred further harvesting and marketing expenses attributable to the hop crop in the amount of $42,015.89. The receipts from the sale of hops for the years 1950, 1951, and 1952, and the expenses incurred attributable to such receipts are as follows: Reported
Reported
Year
hop receipts
expenses
1950
$108,246.42
$85,820.81
1951
88,506.31
82,826.96
1952
46,445.72
86,181.55
The total crop production for 1952, in terms of pounds, the salable quantity of the crop, the amounts sold, and the unit price per pound received and the total receipts for the 1952 hops are shown by the following: 1952 CROP HOPS
Total crop - per Hop Control Board
152,740 pounds
Salable percentage
65.7%
Salable allotment
100,350 pounds
Sales
Bales
Pounds
Price
Amount
Jos. Schlitz Brewing Co.
246
48,716
52 $25,332.32
Hans Hinrichs Hops Co., Inc.
32
7,643
67 5,120.81
Paul Reinemann Co.
1
228
42 95.76
Paul Reinemann Co.
13
2,399
42 1,007.58
Yakima Chief Ranches, Inc.
226
45,697
34 15,536.98
518
104,683
$47,093.45
Certificate purchase
2,399
27 647.73
518
102,284
$46,445.72
*58 No contracts for the sale of the 1952 hop crop to dealers or users or any other persons had been executed by either the corporation or the decedent as of July 31, 1952. The net income reported by decedent for the year 1950 was $36,241.51; for the year 1951, $30,344.40. In her Federal income tax return for 1952 decedent reported a net farm loss on the operation of the Eola Farms in the amount of $43,385.90. When this loss was offset against other income received by the decedent in 1952 the result, as reported on her tax return, was a net loss of $8,731.03. The average cost of planting and cultivating hops on lands in the vicinity of the Eola Farms during the year 1952 was from 22 to 25 cents per pound, and the average cost of harvesting and baling was from 20 to 25 cents per pound. The growing crop of hops distributed to the decedent was not matured on July 31, 1952, and the risk of loss from mildew and other crop diseases was practically nonexistent at that date. The crop matured during the latter part of August and the early part of September, 1952. The average market price for the type of hops grown on the Eola Farms as of July 31, 1952, was between 49 and 52 cents per *59 pound. In the latter part of August the price range was between 30 and 35 cents per pound. In the middle of October the market became more active and through November ranged from 45 to 50 cents per pound, and during December the price ranged from 50 to 53 cents per pound. The hop industry has been suffering from serious overproduction since 1950. The market, for the most part of 1952, was relatively inactive. Under the Agriculture Market Agreement Act of 1937 the industry put into effect an agreement providing the industry with authority to bring supplies in balance with demand. The agreement was administered by a Hop Control Board made up of growers, dealers, brewers, and Government representatives. The Board met in the late summer of each year and made a survey of prospective demand and other factors which might affect market conditions. It determined what they considered to be the salable quantity of crop then planted - a quantity which the trade could consume and which would reflect a fair return to the grower. The Board made a recommendation as to salable quantity, which was transmitted to the Secretary of Agriculture for final decision. The Secretary considered the recommendation *60 of the Board, along with other pertinent data, and issued a final salable quantity. In general, the Board's recommendation as to the salable quantity was adopted by the Secretary without substantial change. In the year 1952 the Board's recommendation did not vary more than one or two per cent from the final decision made by the Secretary of Agriculture. The overall salable quantity for the hop industry determined by the Secretary was a percentage of each grower's crop and the growers could not market more than such established percentage. Nevertheless, it was necessary for each grower to harvest all his crop, including the unsalable portion. The salable percentage of each grower's crop was slightly in excess of 85 per cent in 1950; approximately 74 per cent in 1951, and in 1952 it was 65.7 per cent. The Hop Control Board met on July 17, 1952, and made its recommendation to the Secretary of Agriculture as to the salable quantity of the crop for that year. R. E. Williams, Jr., a son of decedent and executor of her estate, had long been active as a grower and dealer in hops. He was a member of the Hop Control Board and in 1952 participated in its deliberations which resulted in *61 recommending that approximately 36 per cent of the crop be declared nonsalable. Williams managed the Eola Farms in 1952, and had managed it since 1940. He handled the decedent's hop-growing affairs in 1952 and for a considerable time prior thereto. He also participated in the decision to dissolve the corporation on July 31, 1952. The fair market value of the growing crop of hops on the Eola Farms property on July 31, 1952, was $11,500. Opinion LEMIRE, Judge: The question presented requires a determination of the fair market value of a growing hop crop on July 31, 1952, on which date the decedent acquired the crop as a liquidating dividend. The petitioner contends that the fair market value of the growing hop crop was not determinable on the critical date in question because the decedent was not willing to sell the crop at less than the cost of planting and cultivating the crop up to the date of the transfer, which cost was in the amount of $44,165.66. This position is premised on the usual definition of the term "fair market value" as the price at which a seller willing to sell at a fair price and a buyer willing to buy at a fair price, both having knowledge of the facts, *62 will trade. The respondent determined the fair market value of the crop as of July 31 to be the amount of $4,375.40, which was calculated by deducting from the total farm revenues for the year 1952 the total cost of the operations of the farm for the period August 1, to December 31, 1952. We do not think the contention advanced by either of the parties furnishes the correct solution to the question in controversy. The statute requires a valuation of the property at the critical date involved. The determination of value is a factual one. No fixed formula is controlling, but the facts of probative force serve to fix value. We are here dealing with a special property which we think admits of no accurate determination, and in such cases recognition is given to the rule of reasonableness and common sense. The record shows that on the critical date the crop was matured to the extent that from then to harvest-time the risk involved from mildew and disease was neglible so that the yield in pounds could be approximately estimated; the range in bid price and cost of harvesting the crop in pounds were known. On July 17, prior to the critical date, the Hop Control Board had made its *63 recommendation to the Secretary of Agriculture as to the percentage of the 1952 crop that would be salable. The decedent's agent, R. E. Williams, Jr., was a member of the Board and was aware of its recommendation, as were hop growers and dealers generally. While the Secretary of Agriculture made the final decision as to the percentage of the hop crop that would be salable, and such decision was made at the end of the year, it was known that it was the general practice of the Secretary to adopt the Hop Control Board's recommendation. In making our determination each specific factor and such facts as might be reasonably anticipated, as of the valuation date, have been accorded such weight as in our judgment the facts and circumstances require. We therefore have found as an ultimate fact that the fair market value of the growing hop crop in question, as of July 31, 1952, was $11,500. Decision will be entered under Rule 50.